PP:KPO
F. #2023R00763

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF ONE APPLE IPHONE 15 PRO MAX CELL PHONE IN LAW ENFORCEMENT CUSTODY AND CURRENTLY LOCATED WITHIN THE EASTERN DISTRICT OF NEW YORK | **APPLICATION FOR A WARRANT TO SEARCH ELECTRONIC DEVICE**<br><br>Case No. 24-MJ-2880 |

### AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, RYAN SHIPLEY, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant authorizing the search for and seizure of electronically stored information, as particularly described in Attachment B, within one Apple iPhone 15 Pro Max cell phone bearing evidence number IA00038427 (the "SUBJECT DEVICE) which is currently in law enforcement possession in the Eastern District of New York, as described in Attachment A.

2.      I am a Special Agent with the Department of Homeland Security, Homeland Security Investigations ("HSI") and have been since 2018.  As such, I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(c), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.  During my tenure at HSI, I have been involved

with the investigation of numerous cases involving narcotics distribution.  Through my training, education and experience, I have become familiar with the manner in which illegal drugs are imported and distributed, the method of payment for such drugs and the efforts of persons involved in drug trafficking to avoid detection by law enforcement.  I have also participated in the execution of various search warrants, including search warrants for electronic and phone evidence such as the one sought herein.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, law enforcement officers, and witnesses.  I am familiar with the facts and circumstances set forth below from my participation in the investigation, my review of the investigative file, and reports of other law enforcement officers involved in the investigation.  Except as explicitly set forth below, I have not distinguished in this affidavit between facts of which I have personal knowledge and facts I learned from other law enforcement agents and officers.

4.      Because this affidavit is being submitted for the limited purpose of establishing probable cause for the requested warrant, I have not set forth each and every fact learned during the course of the investigation described below.  Instead, I have set forth only those facts that I believe are necessary to establish probable cause for the warrant sought herein.

5.      Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 841 (distribution and possession with intent to distribute controlled substances), 846 (controlled substance distribution conspiracy), 952 (importation of controlled substances) and 960 (conspiracy to import controlled substances) collectively, the "Subject Offenses")  have been committed by SIXTO SIME, together with

others and there is probable cause to search the Subject Device described in Attachment A for evidence of these crimes, as further described in Attachment B.

## **IDENTIFICATION OF THE SUBJECT DEVICE**

6.      The electronic device to be searched is an Apple iPhone 15 Pro Max cell phone bearing evidence number IA00038427 ("SUBJECT DEVICE"), shown below:

 

7.      The SUBJECT DEVICE is currently in law enforcement custody in the Eastern District of New York.

8.      The applied-for warrant would authorize the forensic examination of the SUBJECT DEVICE for the purpose of identifying electronically stored data particularly described in Attachment B.

**PROBABLE CAUSE**

I.      Summary of Cocaine and Fentanyl Purchases

9.      On March 5, 2024, the Honorable Cheryl Pollak, United States Magistrate Judge for the Eastern District of New York ("the March 5th Warrant") authorized a search warrant for cell site location information for a phone number connected to Kenneth Aponte (the "Aponte Number").

10.     During the course of the investigation, HSI obtained information on Aponte from an undercover law enforcement agent ("UC").  The UC purchased narcotics from Aponte on thirteen separate occasions; the UC purchased a handgun from Aponte once.  Between approximately October 4, 2023 and March 15, 2024, the UC's narcotics purchases from Aponte typically unfolded in a similar pattern: the UC and Aponte would communicate using a phone number provided by Aponte.[1]  On phone calls, Aponte and the UC agreed upon the terms of the purchase – the specific narcotic, amount, price and meeting location and time.  During each of those occasions, the UC arranged to purchase heroin, cocaine or both heroin and cocaine from Aponte.  On each occasion, Aponte and the UC met; Aponte gave the UC the promised narcotics in exchange for UC giving Aponte U.S. currency.  All of the sales were recorded on video and audio. When tested by the New York City Police Department ("NYPD"), each of the samples tested positive for at least heroin and fentanyl and at least six samples also had a fentanyl

---

[1] APONTE initially used a T-Mobile account with the call number (929) 690-6408 (the "-6408" number) then, on or about February 21, 2024, APONTE called the UC on the APONTE Number and told the UC to save the Aponte Number and delete the -6408 number.  Prior search warrants for prospective location information associated with the (929) 690-6408 number were granted under Magistrate Docket 23-MJ-3336 on December 6, 2023, January 5, 2024, and February 3, 2024.

analogue in the substance.  When tested by the NYPD, samples of substances that Aponte reported were cocaine tested positive for cocaine.

II.     SIME is Identified as One of APONTE's Co-Conspirators

11.     On October 12, 2022, law enforcement arrested another individual, Jahan Norman, pursuant to a complaint and arrest warrant signed by the Honorable Marcia M. Henry, Magistrate Judge of the United States Court for the Eastern District of New York (No. 22-MJ-1079).  Norman was charged with possession with intent to distribute heroin and fentanyl. Pursuant to a search warrant authorized by the Honorable Robert Levy, Magistrate Judge of the United States Court for the Eastern District of New York (No. 22-MJ-1090), on October 12, 2022, law enforcement agents seized a cell phone belonging to Norman that contained correspondence with Aponte and SIME.

12.     My review of the contents of Norman's cell phone identified that Norman generally bought controlled substances from SIME.  However, when SIME was unavailable, SIME referred Norman to Aponte or another individual.  For the reasons set forth below, there is probable cause to believe that Aponte and SIME continue to distribute controlled substances after Norman's arrest.

13.     Aponte has referenced a "partner" several times to the UC.  Based on my training and experience, I understand Aponte to be referring to a business partner for controlled substance importation and distribution.  Aponte previously told the UC that Aponte's partner served 27 years in jail and called his partner a murderer.  SIME was previously convicted of intentional murder in the second degree and served approximately 26 years in jail.

5

14.     In the afternoon of February 16, 2024, Aponte told the UC that his "mans" was in the Dominican Republic getting things straightened out.  Aponte had previously told the UC that he was having issues getting his supply of controlled substances from the Dominican Republic to New York.  Based on my experience and training, I understand that Aponte meant his partner was in the Dominican Republic re-establishing the supply line for their controlled substance importing.  Travel records reflect that SIME flew from John F. Kennedy International Airport ("JFK Airport") in Queens, New York to the Dominican Republic the morning of February 16, 2024.

15.     On or about April 3, 2024, SIME traveled to Newark Liberty International Airport in Newark, New Jersey from the Dominican Republic and a border search was conducted of a cell phone in SIME's possession (the "April Sime Phone") which SIME provided after Customs and Border Protection requested the phone.[2]  SIME voluntarily provided the passcode to the April Sime Phone.

16.     SIME's phone contained conversations on the encrypted messaging application WhatsApp between SIME and a user "Hype" who had a profile picture that appears consistent with Aponte's appearance.  I am aware of Aponte's appearance because I have watched video recordings of the UC buys and I have conducted in-person surveillance of him.  This phone also contained a contact card for "Hype" that lists (646) 995-0598 as the phone number and Aponte used this number on a financial transaction application.

_____

[2] The federal government has "broad plenary powers to conduct so-called 'routine' searches at the border even without 'reasonable suspicion that the prospective entrant has committed a crime.'" United States v. Levy, 803 F.3d 120, 122 (2d Cir. 2015) (quoting Tabbaa v. Chertoff, 509 F.3d 89, 97-98 (2d Cir. 2007)).

17.     In the WhatsApp conversation, Aponte sent SIME a photo of what appears to be compressed white powdery substances with the message "That's 648." Based on my training and experience, I understand this to mean that Aponte sent SIME a photo of 648 grams of cocaine.

18.     I also reviewed a message from SIME to Aponte on October 22, 2023 at approximately 5:01 a.m. in which SIME said "Don't tell her but she comes w 5 not 4 this trip[;] Gm[;] going to bed" and Aponte responded "Gm she said she lands round 8:45." Based on flight records, Marbelly Leonardo ("Leonardo") discussed further below, traveled from the Dominican Republic to JFK Airport on October 22, 2023 and was scheduled to arrive on a flight landing at approximately 8:45 a.m., however Leonardo switched to a different flight the same day.

19.     I also reviewed a photo sent on November 9, 2023 at approximately 8:35 a.m. from Aponte to SIME in which Aponte sent a photo of a compressed white powdery substance on a scale with the scale showing "204" and a message that said "204." Based on my training and experience, I understand this to mean that Aponte sent SIME a photo of 204 grams of cocaine.

III.     <u>Leonardo is Identified as SIME's and Aponte's Co-Conspirator</u>

20.     I believe that one source of Aponte's cocaine is through Leonardo who was working as a flight attendant working for an international airline ("International Airline-1"). I believe that she couriers cocaine from the Dominican Republic through JFK Airport.

21.     A review of SIME's travel records identified that Leonardo frequently booked travel for SIME between JFK Airport and the Dominican Republic, including the February 16, 2024 trip that Aponte reported to the UC.

22.     On January 26, 2024, I observed Aponte pick-up Leonardo from JFK Airport and take her to SIME's then-residence.  Specifically, I observed Aponte leaving his residence at approximately 9:16 p.m., carrying a white plastic bag that looked flimsy as if it were empty or had only something small or light inside.  Aponte got into a Jeep Grand Cherokee with New York license plate KFN-6553 (the "Jeep") and drove to JFK Airport.

23.     On January 26, 2024, Leonardo traveled from the Dominican Republic to JFK Airport on a flight operated by an international airline ("International Airline-2") which landed at JFK Airport at approximately 11:00 p.m.  During my April 2024 border search of SIME's phone, I observed a text message from SIME to "Hype"–i.e., Aponte–in which SIME sent "10:20 Lands" and Aponte responded with the name of International Airline-2.  Based on my training and experience, these messages are consistent with Aponte and SIME discussing Leonardo's travel.

24.     At approximately 10:57 p.m. on January 26, 2024, at JFK, Aponte waived over Leonardo who was wearing her flight attendant uniform.  Leonardo carried a purse and placed one piece of luggage behind the driver's seat of the Jeep.

25.     Aponte then drove towards Manhattan.  Law enforcement continued surveillance in a nearby car and observed that Leonardo grabbed what appeared to be her purse and moved objects around the inside of the center console of the Jeep for an extended period of time.

26.     At approximately 12:03 a.m. on January 27, 2024, Aponte parked the Jeep on East 4th Street in Manhattan; he and Leonardo walked into 340 East 4th Street which is a building containing an apartment registered to SIME, carrying at least one bag.

27.     At approximately 12:45 a.m., Aponte left SIME's building alone and got back in the Jeep.  He drove to and parked on East 8th Street and walked into a building located at 334 East 8th Street.  Aponte left the Jeep carrying the same white plastic bag he had initially, however, this time the bag appeared to be full and squared off on the bottom.

28.     Aponte also told the UC about Leonardo.  During the UC buy on February 2, 2024, Aponte told the UC that he had a "stewardess" who brings cocaine on their body from the Dominican Republic to the U.S. Throughout the conversation, Aponte referred to the flight attendant using female pronouns.  In the same conversation, Aponte said that the flight attendant almost got caught going through the airport in the Dominican Republic with cocaine, but she paid $1,000 in U.S. currency to a Dominican Republic official to allow her to go through the airport.  Aponte said that, in addition to bringing cocaine from the Dominican Republic to the U.S., the flight attendant brings money from the U.S. to the Dominican Republic.  On February 16, 2024, Aponte repeated to the UC that a flight attendant was one cocaine trafficking route for Aponte and his partner.

IV.     Leonardo is Arrested at Newark Liberty International Airport with 1.5 Kilograms of Cocaine

29.     On or about April 26, 2024, Leonardo made a day trip to the Dominican Republic on an airline separate from her employer.  She traveled back into Newark, New Jersey and was stopped and searched by Customs and Border Protection ("CBP").  CBP found approximately 1.57 kilograms of a white powdery substance that field tested positive for cocaine, strapped to her person.  Leonardo was charged in the District of New Jersey for cocaine importation by complaint; the complaint was later dismissed.

V.      SIME and Aponte are Charged by Complaint

30.      On or about May 1, 2024, a complaint charging SIME and Aponte with
conspiracy to import cocaine was signed by the Honorable Marcia M. Henry, Magistrate Judge
of the United States Court for the Eastern District of New York (No. 24-MJ-340).  Two arrest
warrants were issued, and Aponte was arrested the next day.

31.      On or about June 19, 2024, SIME was arrested in the Dominican Republic by
local authorities then transferred to the custody of the U.S. Marshals Service who transported
him to the U.S.  Prior to arresting SIME, law enforcement agents surveilled a house in which
SIME was living in the Dominican Republic (the "Residence").  On or about June 19, 2024, law
enforcement agents waited for SIME to leave the house and then arrested him once he was
outside of the house.  The SUBJECT DEVICE was seized from SIME's person, following
SIME's arrest.  The SUBJECT DEVICE was transported to HSI in the Eastern District of New
York.  SIME was presented on approximately June 22, 2024 and an order of detention was
entered.

VI.      SIME, Aponte and Leonardo are Indicted

32.      On or about July 2, 2024, a grand jury sitting in the Eastern District of New York
indicted SIME, Aponte and Leonardo, charging them with two counts: conspiracy to import
cocaine and cocaine importation, in violation of Title 21, United States Code 960 (conspiracy to
import cocaine) and Title 21, United States Code 952 (importation of cocaine). See U.S. v. Sixto
Sime et al., 24-CR-271 (NRM).

33.      Based on the foregoing, there is probable cause to believe that SIME uses mobile
devices and electronic communications in furtherance of these drug trafficking offenses, and the

electronic data stored on the SUBJECT DEVICE, as described in Attachment B, constitutes evidence of the Subject Offenses.  Law enforcement agents have previously observed communications on a cellular device belonging to SIME regarding the Subject Offenses.  There is probable cause to believe that the SUBJECT DEVICE will contain evidence corroborating the existence of relationships between and among SIME, Aponte and Leonardo, including but not limited to communications between these co-conspirators about the planning, preparation, and results of the Subject Offenses.

## **TECHNICAL TERMS**

34.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a.   Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing

and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.  Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.   Global Positioning System ("GPS"):  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.   Personal Digital Assistant ("PDA"):  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same

capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

    f.   Internet Protocol ("IP") Address: An IP address is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

    g.   Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

35.    Based on my training, experience, and research, I know that the SUBJECT DEVICE has capabilities that allows it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

14

## **ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

36.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

37.     *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the SUBJECT DEVICE was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the SUBJECT DEVICE because:

   a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b.  Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

38.  *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

39.  *Manner of execution.*  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## **CONCLUSION**

40.     I submit that this affidavit supports probable cause for a search warrant

authorizing the examination of the SUBJECT DEVICE described in Attachment A to seek the

items described in Attachment B.


                                        Respectfully submitted,
                                        /s/ Ryan Shipley
                                        _____
                                        Ryan Shipley
                                        Special Agent
                                        Department of Homeland Security, Homeland
                                        Security Investigations

Subscribed and sworn to before me
by telephonic means on July __, 2024:     July 23, 2024

_____
THE HONORABLE SANKET J. BULSARA
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

17

**ATTACHMENT A**

The electronic device to be searched is an Apple iPhone 15 Pro Max cell phone bearing

evidence number IA00038427 ("SUBJECT DEVICE"), shown below;

 

The SUBJECT DEVICE is currently in law enforcement custody in the Eastern District

of New York.

This warrant authorizes the forensic examination of the SUBJECT DEVICE for

the purpose of identifying the electronically stored information described in Attachment B.

**ATTACHMENT B**

1.      All records on the SUBJECT DEVICE described in Attachment A that relate to

violations of Title 21, United States Code, Sections 841 (distribution and possession with intent

to distribute controlled substances), 846 (controlled substance distribution conspiracy), 952

(importation of controlled substances) and 960 (conspiracy to import controlled substances) from

October 22, 2023 through June 19, 2024, those violations involving SIXTO SIME, Kenneth

Aponte and Marbelly Leonardo, and/or other co-conspirators, including:

a.   Evidence related to the preparation of the Subject Offenses, including messages
     revealing the co-conspirator's plans to commit the Subject Offenses, calls,
     Internet searches, and other communications or use of cellphone applications,
     such as airline travel history;

b.   Evidence concerning the commission of the Subject Offenses and/or
     instrumentalities of the Offenses, including: photographs of cocaine or packaging
     for cocaine, travel history records, and other location data regarding the co-
     conspirators' whereabouts at or around the time of the Subject Offenses;

c.   Photographs, records, and communications regarding purchasing cocaine or other
     controlled substances;

d.   Evidence related to the co-conspirators' state of mind, including messages
     revealing their intentions before or after the trips to the United States, Internet
     searches regarding possible penalties, calls, and other communications or use of
     cellphone applications;

     e.    Evidence concerning the identity or location of, and communications with, co-conspirators in the Subject Offenses, including contact lists, call logs, text messages, e-mails, and photographs;

     f.    Location of other evidence of the Subject Offenses (e.g., messages reflecting online accounts or electronic devices potentially containing relevant evidence);

     g.    Records or evidence concerning the proceeds of cocaine importation and/or sales;

     h.    Evidence relating to a conspiracy between SIME, Aponte and Leonardo, and/or any other co-conspirators; and

     i.    Records and information which assist in placing the above-described evidence in context.

2.    Evidence of user attribution showing who used or owned the SUBJECT DEVICE at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law

enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, HSI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.